IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JESSICA LEE SERGENT,                )
                                    )
            Plaintiff,              )
                                    )
v.                                  )           CIVIL ACTION NO. 2:15-00352
                                    )
CAROLYN W. COLVIN,                  )
Acting Commissioner of Social Security,  )
                                    )
            Defendant.              )

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-

1383f. This case is presently pending before the Court on the Parties' cross-Motions for Judgment

on the Pleadings. (Document Nos. 9 and 10.) Both parties have consented in writing to a decision

by the United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Jessica Lee Sergent (hereinafter referred to as "Claimant"), filed applications

for DIB and SSI on October 18, 2011 (protective filing date), alleging disability as of December

6, 2008,[1] due to "neck injury, headaches, nerve damage to right arm and shoulder, depression,

[and] arthritis."[2] (Tr. at 10, 176-77, 178-79, 180-85, 216, 233.) The claims were denied initially

and upon reconsideration. (Tr. at 10, 56-93, 94-96, 99-101, 109-11, 113-15, 116-18, 120-22.) On

July 17, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at

---

[1] At the administrative hearing, Claimant amended her alleged onset date to April 1, 2009. (Tr. at 48.)

[2] On her form Disability Report – Appeals, dated July 25, 2012, Claimant alleged the following changes in her medical conditions: "Neck has got[ten] worse, having more pain, more numbness in my right arm and hand, disc in my neck is pushing into my spinal cord." (Tr. at 267.)

123-24.) The hearing was held on June 10, 2013, before the Honorable Maria Hodges. (Tr. at 27-55.) By decision dated July 15, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-21.) The ALJ's decision became the final decision of the Commissioner on November 14, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On January 7, 2015, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the

2

Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

3

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2013).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because although she engaged in substantial gainful activity from December 6, 2008, to March 31, 2009, Claimant had not engaged in substantial gainful activity since April 1, 2009, the amended alleged onset date. (Tr. at 12-13, Finding Nos. 2 and 3.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative disc disease, which was a severe impairment. (Tr. at 13, Finding No. 4.) At the third inquiry, the ALJ concluded that Claimant's impairment did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14, Finding No. 5.) The ALJ then found that Claimant had a residual functional capacity to perform light exertional level work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can frequently balance, stoop, kneel, and climb ramps and stairs, but can only occasionally crouch, crawl, and climb ladders, ropes, and scaffolds. She can occasionally reach overhead and can frequently

handle and finger with her right, dominant arm; she can frequently reach in all other directions. She must avoid concentrated exposure to extreme cold, wetness, humidity, vibrations, pulmonary irritants, and workplace hazards.

(Tr. at 15, Finding No. 6.) At step four, the ALJ found that Claimant was able to perform her past relevant work as a clerical worker and cashier. (Tr. at 19, Finding No. 7.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ further concluded that Claimant could perform jobs such as a routing clerk and counter clerk, at the unskilled, light level of exertion, and as a bench worker and a security monitor at the unskilled, sedentary level of exertion. (Tr. at 20, Finding No. 7.) On these bases, benefits were denied. (Tr. at 20-21, Finding No. 8.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

6

Claimant's Background

Claimant was born on August 23, 1979, and was 33 years old at the time of the administrative hearing, June 10, 2013. (Tr. at 19, 178, 180.) Claimant had at least a high school education and was able to communicate in English. (Tr. at 19, 232, 234.). Claimant had past relevant work as a clerical worker, cashier, and nursing assistant. (Tr. at 19, 234, 249-56.)

The Medical Record.

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

On December 6, 2008, Claimant was involved in a motor vehicle accident when the vehicle in which she was a passenger was rear ended. (Tr. at 326, 329.) Claimant was restrained by her seatbelt and the airbags were not deployed. (Id.) Nevertheless, Claimant was jarred severely, backward and forward, and on December 7, 2008, reported to the emergency department at Cabell Huntington Hospital with complaints of neck pain and headache. (Tr. at 326, 329, 469.) Physical exam revealed moderate tenderness of the paraspinal muscles of the neck. (Id.) The x-rays of Claimant's cervical spine were unremarkable. (Tr. at 343.) She was given a differential diagnosis of cervical strain and was discharged home in improved condition. (Tr. at 327, 330.)

Claimant returned to the emergency department on December 9, 2008, with complaints of thoracic back pain and muscle spasm. (Tr. at 305-06, 308-09.) She reported that the onset of pain was gradual with increased pain down her bilateral trapezius muscles and down the right arm. (Tr. at 305, 308.) Physical exam revealed decreased range of right arm motion due to pain. (Id.) She was diagnosed with muscle spasm and discharged home with a prescription for Tramadol. (Tr. at 306, 309.)

On April 3, 2009, Claimant treated with Dr. Jon Bowen, M.D., of Lincoln County Primary Care Center, for a tension headache. (Tr. at 415-16, 1532-33.) She was started on Depakote as a mood stabilizer and for prophylaxis of the headaches. (Tr. at 416, 1533.) Claimant returned to Dr. Bowen on

May 19, 2009, with complaints of continued headaches, with a several month history. (Tr. at 417-19, 1534-35.) Dr. Bowen again diagnosed tension headache and prescribed Hydrocodone. (Id.)

Claimant underwent physical therapy for her neck pain from May 29, 2009, through August 3, 2009. (Tr. at 374-78, 1536.)

An MRI scan of Claimant's cervical spine on October 5, 2009, revealed an apparent annular tear within the paracentral aspect of the C5-6 disc, with associated degenerative change. (Tr. at 386-87, 428-29, 544-46, 587-88, 716-17, 1546-47.)

On October 15, 2009, Dr. Bowen acknowledged Claimant's complaints of right facet pain in the cervical spine and diagnosed cervicalgia. (Tr. at 430-31, 590-91, 719-20.) He noted consistently on physical exam that Claimant had normal strength and gait. (Tr. at 430, 432, 434, 437, 438, 441, 444-45, 447, 450, 452, 454, 457, 590.)

On November 4, 2009, Claimant was examined by Dr. James D. Weinstein, M.D., a neurosurgeon, for complaints of pain in the back of her neck that radiated to the head, shoulders, and right arm. (Tr. at 392, 572, 574, 699, 701, 1550, 1553.) Dr. Weinstein noted that the MRI scan revealed modest abnormalities and therefore, he did not recommend surgery. (Id.) He opined that there was a probability that she would have trouble in the future. (Id.) Claimant returned to Dr. Weinstein on May 12, 2010, at which time he noted that in the intervening six months since he last examined Claimant, she reported that her condition had worsened with pain in the jaw, ear, and right arm, with finger numbness. (Tr. at 391, 570-71, 695-96.) He noted that there was no upper motor neuron signs of cord compression, but that given that her symptoms had worsened, Dr. Weinstein opined that she "might need surgery." (Id.)

A further MRI scan of Claimant's cervical spine on June 1, 2010, revealed a stable appearance of a right central disc herniation of the protrusion type at C5-6, with no significant neural compression. (Tr.at 382, 389-90, 440, 547, 567-68, 691-92, 1561.) On June 3, 2010, Dr. Weinstein recommended

conservative treatment, despite a worsening of Claimant's symptoms. (Tr. at 388, 565-66, 688-89.)

On April 4, 2011, Dr. Bowen noted continued complaints of right facet pain in the cervical spine, with trigger points. (Tr. at 449.) Consequently, he administered trigger point injections. (Tr. at 450.) Dr. Bowen continued to administer a series of trigger point injections. (Tr. 452, 454, 457.) On December 15, 2011, Claimant reported that Dr. Bowen had decreased the strength of her pain medication, Hydrocodone, and that was unable to handle the pain. (Tr. at 1576.) Physical examination revealed that Claimant had intact motor and sensory functions, as well as a normal gait. (Tr. at 1577.)

Dr. Bowen administered Claimant's last trigger point injection on January 11, 2012. (Tr. at 524-25.) On January 31, 2012, Claimant reported neck pain and worsened right upper extremity numbness, burning, and pain. (Tr. at 1580.) Physical exam revealed decreased right upper extremity motion secondary to pain, equal grip strength bilaterally, and no decreased in muscle tone. (Tr. at 1581.) On March 30, 2012, Claimant reported constant neck pain, with occasional sharp pains in her right arm. (Tr. at 1583.) Claimant advised that the Neurontin helped with the occasional sharp pains. (Id.) Physical exam revealed muscle spasm in the upper trapezius, mostly on the right. (Tr. at 1585.) Claimant signed a controlled substance agreement and it was recommended that she have a further MRI. (Id.)

On April 6, 2012, an MRI scan of Claimant's cervical spine revealed right paracentral disc extrusion at C5-6. (Tr. at 548, 1587.)

On April 12, 2012, Dr. Bruce A. Guberman, M.D., an internal medicine and cardiovascular specialist, examined Claimant at the request of her attorney. (Tr. at 469-78.) Claimant reported that since her injury, the neck pain progressively worsened and she experienced constant, sharp to dull pain in the cervical spine with radiation into the posterior aspect of her head, and at times the sides and front of her head with the right side more severely involved than the left side. (Tr. at 471.) She reported radiation of pain into both shoulders, right greater than the left and radiation into the fingers of her

9

right hand. (Id.) She stated that she had numbness, tingling, and weakness of her right hand and arm, with intermittent shaking of her right hand and arm. (Id.) Her neck pain was made worse by rapid head movements or by turning the head far in either direction. (Id.) Claimant also reported almost constant pain in the thoracic region of the spine, without radiation. (Id.)

Physical examination revealed an antalgic, but steady gait and that Claimant was uncomfortable in the supine and sitting position. (Tr. at 472.) Claimant exhibited severe tenderness of the cervical spine and mild tenderness of the thoracic spine, without spasm. (Tr. at 473.) She had reduced ranges of motion. (Id.) Claimant had moderate tenderness of the right shoulder, with reduced range of motion and had normal elbow range of motion. (Id.) She was able to button and pick up coins with either hand without difficulty and was able to write normal with the dominant, right hand. (Tr. at 474.) Dr. Guberman noted weakness of the right arm, graded at 4/5. (Id.) Dr. Guberman diagnosed acute and chronic cervical and thoracic spine strain, post-traumatic. (Id.) Dr. Guberman opined that Claimant's diagnoses and symptoms, causally and solely were related to the motor vehicle accident injury on December 6, 2008. (Tr. at 474-75.) He opined that Claimant had reached maximum medical improvement and that "further improvement is not likely with any planned treatment. (Tr. at 475.) Dr. Guberman further opined that "her condition, symptoms, impairment and limitations of activities of daily living with radiculopathy will continue to progressively worsen." (Id.) He believed that she would require permanent chronic medical follow-up that included medication, physician visits, and injections. (Id.) Dr. Guberman also thought that she needed to see Dr. Weinstein in the near future for further reconsideration of surgery. (Id.) He believed that she eventually would require "disc surgery with discectomy and fusion at the C5-C6 level." (Id.) Surgery would be required because her signs and symptoms of radiculopathy had progressed. (Id.) Dr. Guberman further opined that Claimant had permanent limitations in her ability to perform daily activities, which made her unable to maintain her prior employment. (Id.) Consequently, Dr. Guberman opined that Claimant had significant limitations

in her ability to sit, stand, bend, stoop, lift, carry, push, or pull and in her ability to use her arms overhead to carry, lift, push, pull, or perform repeated activities. (Id.) He recommended an eighteen percent impairment of the whole person for the cervical spine aspect of Claimant's injury and a seven percent impairment of the whole person for the thoracic spine aspect of her injury, for a total of 24 percent impairment of the whole person. (Tr. at 475-76.)

On May 3, 2012, Dr. Weinstein acknowledged Claimant's increased symptoms and noted that the MRI of April 6, 2012, showed a progression of the slight disc herniation that previously was evident. (Tr. at 551, 645-46, 670-71, 1588.) He opined that Claimant had "reached the point that I would recommend surgery." (Tr. at 551, 645, 670, 1588.) Dr. Weinstein noted that Claimant had been examined by Dr. Alberico, who will perform the surgery. (Id.) Dr. Anthony Alberico, M.D., also examined Claimant on May 3, 2012, and opined that she would benefit from ACDF at C5-C6. (Tr. at 552, 1588.)

On May 10, 2012, at the request of Claimant's attorney, Claimant was referred to Elizabeth Davis, R.N., a Certified Life Care Planner and Rehabilitation Counselor, for a rehabilitation assessment. (Tr. at 598-609.) Ms. Davis concluded that Claimant was suitable to performing sedentary and light, unskilled work on a part-time basis, or up to 20 hours per week, which reflected Dr. Guberman's recommendations for physical limitations. (Tr. at 608.)

On May 25, 2012, Dr. Rabah Boukhemis, M.D., a State agency reviewing medical consultant conducted a physical RFC assessment and concluded that Claimant was capable of lifting 20 pounds occasionally and 10 pounds frequently and sit, stand, or walk for six hours in an eight-hour workday. (Tr. at 78.) Dr. Boukhemis assessed postural limitations and recommended that she avoid concentrated exposure to extreme cold, wetness, humidity, vibration, environmental irritants, and hazards. (Tr. at 78-/79.)

On August 9, 2012, Claimant underwent an independent neurological evaluation by Dr.

Constantino Y. Amores, at the request of her attorney. (Tr. at 612-34.) Claimant reported that he drove 40 miles to the evaluation and continuously sat for the duration of the two hour evaluation without complaining of pain except when asked to move her head. (Tr. at 614.) On physical examination, Claimant exhibited significantly limited range of neck motion, worse on extension and turning to the right when she complained of the pain and numbness radiating to the right arm. (Tr. at 615.) She had a normal gait and full active range of motion of all extremities. (Id.) Dr. Amores noted pain and tenderness to palpation of the right para vertebral muscles and diagnosed herniated C5-6 disc with radiculopathy, cervical spondylosis, and chronic pain syndrome. (Id.) He opined that there definitely was a causal relationship between Claimant's complaints and reported injury and that her prognosis was guarded, "particularly with the chronic pain syndrome and the prolonged use of pain medications." (Tr. at 616.) Dr. Amores further opined that Claimant's herniated cervical disc condition was permanent. (Tr. at 617.)

On August 30, 2012, Dr. Alberico noted that Claimant cancelled the scheduled surgery "due to obligations with her children." (Tr. at 637, 660, 1465.) He noted that Claimant's symptoms had worsened and that she had progressive numbness in the entire right arm with some additional weakness. (Id.) She also had developed some left-sided symptoms at the base of her neck into the shoulder, which did not extend to the hand. (Id.) Dr. Alberico noted decreased motor strength, 4/5, and that the left side was approaching 5/5. (Tr. at 638, 1466.) He recommended a more recent study, if Claimant intended to proceed with surgery. (Tr. at 639, 1467.)

An MRI scan of Claimant's cervical spine on October 1, 2012, revealed right paracentral disc osteophyte complex at the C5-6 level. (Tr. at 1463-64.) The previously seen extruded fragment at that level no longer was evidence and there was stable, mild, right-sided canal narrowing. (Tr. at 1464.)

On October 1, 2012, Claimant reported to Dr. Alberico that she experienced neck pain with radiation to the right arm, with some pain that started to develop on the left side. (Tr. at 1461.) He

opined that Claimant "would probably benefit from anterior cervical decompression arthrodesis at C5-6." (Id.) On November 9, 2012, Dr. Alberico acknowledged Claimant's complaints of neck pain with radiation into the right upper extremity. (Tr. at 1458.) Physical exam revealed pain, tingling, and diminished motor strength on the right, but normal findings on the left. (Tr. at 1460.) He diagnosed cervical herniated disc in stable condition. (Id.)

On April 24, 2013, Claimant reported that after she lifted a gallon of milk, she experienced increased pain in her neck, shoulder, and right arm. (Tr. at 1614.) She reported that she felt increased burning, although the condition had improved. (Id.) Physical examination revealed near normal grip strength on the right and normal strength on the left. (Tr. at 1615.) She continued to be diagnosed with cervicalgia. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ improperly assessed her credibility. (Document No. 9 at 5-6.) Citing Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987), Claimant argues that she satisfied the requirements of 42 U.S.C. § 423(d)(5)(A), as her allegations and the medical evidence are mutually supportive. (Id. at 5-6.) She further argues that the ALJ summarily concluded that she was not entirely credible and that the ALJ's use of boilerplate credibility language "will not suffice for a valid credibility determination." (Id. at 6.) Claimant asserts that the ALJ "made improper assumptions" about her testimony and "arrived at unfair and incorrect conclusions." (Id.) Specifically, Claimant asserts that the ALJ improperly equated her fear to elect back surgery to a suggestion that her condition was "not as bothersome as" she alleged. (Id.) Claimant explains that as a single parent to four children, she was "hesitant to undergo a procedure that could result in paralysis and thereby impact her ability to raise her children." (Id.)

In response, the Commissioner contends that substantial evidence supports the ALJ's credibility determination. (Document No. 10 at 9-12.) The Commissioner asserts that Claimant's

13

subjective complaints were "quite extreme" and agrees with Claimant that boilerplate language is not sufficient for a credibility analysis. (Id. at 9-10.) The Commissioner asserts however, that the ALJ discussed many reasons that supported her credibility determination, including a lack of consistency in Claimant's allegations, a lack of consistency between Claimant's allegations and the record evidence, the reasons for cancelling her surgery, and Claimant's reported daily activities. (Id. at 10-12.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing her RFC when she equated Claimant's ability to driving 40 miles to an evaluation and ability to sit for entire two hours of the evaluation, to the ability to stand, walk, or sit for six hours out of an eight-hour workday. (Document No. 9 at 6.) She further asserts that the ALJ erred in summarily rejecting and misconstruing the opinions of Drs. Weinstein, Alberico, Amores, and Guberman, and relying on the findings of the State agency medical consultants, who were non-treating and non-examining sources. (Id. at 7-8.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's analysis of the medical opinions. (Document No. 10 at 12-15.) The Commissioner asserts that Claimant merely discusses Dr. Amore's diagnosis and recommendation for surgery, but provides "no insight into any work-related functional limitations." (Id. at 13.) Although the ALJ noted Claimant's ability to have driven 40 miles to the evaluation and to sit continuously for two hours during the evaluation, she also assessed the limited range of motion of Claimant's neck, with tenderness, but had a normal gait and full range of extremity motion. (Id.) The Commissioner therefore, contends that substantial evidence supports the weight accorded Dr. Amore's opinion. (Id. at 13-14.)

The Commissioner next asserts that substantial weight supports the limited weight the ALJ gave Dr. Guberman's opinion. (Id. at 14.) Although Claimant highlights Dr. Guberman's diagnoses, MRI results, and estimated medical expenses, the Commissioner asserts that these factors provided no

insight into Claimant's functional limitations. (Id.) The Commissioner further asserts that it was proper

for the ALJ to discount Dr. Guberman's opinion on the basis of Dr. Boukhemis's opinion. (Id.)

Third, the Commissioner asserts that contrary to Claimant's argument, the ALJ properly

considered the fact that Drs. Weinstein and Alberico recommended surgery, but the ALJ's finding that

Claimant's decision not to proceed suggested that she was not in crippling pain as alleged. (Id. at 14-

15.)

Analysis.

    1.  Pain and Credibility Assessment.

Claimant alleges that the ALJ erred in assessing her credibility. (Document No. 9 at 5-6.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms.

First, objective medical evidence must show the existence of a medical impairment that reasonably

could be expected to produce the pain or symptoms alleged.   20 C.F.R. §§ 404.1529(b) and 416.929(b)

(2013); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). A claimant's

"statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R.

§§ 404.1529(a) and 416.929(a) (2013). If such an impairment is established, then the intensity and

persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work

must be evaluated.   Craig v. Chater, 76 F.3d at 595. When a claimant proves the existence of a medical

condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of

pain] must be considered by the Secretary, and these complaints may not be rejected merely because

the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918,

919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the

absence of such evidence is not determinative.   Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990).

In Hines v. Barnhart, 453 F.3d 559, 565 n.3 (4th Cir. 2006) (citing Craig v. Chater, 76 F.3d at 595),

the Fourth Circuit stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.   20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2013).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.   . . .   Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2013).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the

allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 15.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 15.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 16-19.) At the second step of the analysis, the ALJ concluded that "the [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 16.)

Claimant argues that under the mutually supportive test recognized in Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987), that she satisfies the requirements of 42 U.S.C. § 423(d)(5)(A), because the evidence of record, including her testimony and statements, is supported by substantial evidence. (Document No. 9 at 5-6.) Claimant has misinterpreted the holding in Coffman. In that case, the issue was not one of credibility but whether the ALJ applied the appropriate standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. Coffman, 829 F.2d at 517-18. The Fourth Circuit concluded that the ALJ had misstated the legal principles and standards and improperly discounted the physician's opinion due to a lack of corroborating evidence. Id. at 518. The Court held that the correct standard required a treating physician's opinion to be "ignored *only* if

there is persuasive contradictory evidence." Id. There, the physician provided medical reports with his opinion letter. Id. The record also included findings of two other physicians and the testimony of the claimant. Id. In view of the of the supporting evidence, the Fourth Circuit noted that [b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of the Social Security Disability Benefits Reform act of 1984, 42 U.S.C. § 423(d)(5)(A)." Id. Accordingly, the undersigned finds contrary to Claimant's argument that Coffman fails to offer any "mutually supportive" test applicable to assessing a claimant's credibility. For the reasons set forth herein, the undersigned finds Coffman inapposite and Claimant's argument without merit.

Claimant also argues that the ALJ's use of boilerplate credibility language warrants remand because such boilerplate language "will not suffice for a valid credibility determination." (Document No. 9 at 6.) Pursuant to SSR 96-7p, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4. "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." Id. The decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id.

In this case, it is clear that the ALJ used boilerplate language regarding the two-step credibility analysis. (Tr. at 15-16.) However, the ALJ went on to explain the specific reasons for her credibility determination and specifically cited the medical evidence, Claimant's testimony and reports, Claimant's activities, and the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). Accordingly, pursuant to SSR 96-7p, the Court finds that the ALJ's credibility finding sufficiently was

articulated and explained with references to the specific evidence that formed her decision. For these reasons, the Court further finds that the ALJ did not conclude summarily, as Claimant alleges, that she was not credible.

Finally, with respect to the ALJ's credibility assessment, Claimant asserts that the ALJ made improper assumptions regarding Claimant's election not to proceed with surgery. As the Commissioner points out, it was the inconsistency in the stated reasons for electing not to proceed with surgery that caused the ALJ to question Claimant's credibility and not so much as the decision itself. However, the ALJ did suggest that the failure to undergo the surgery may have indicated that Claimant's allegations of disabling pain were not as severe as alleged, else she would have proceeded with the surgery. As the Commissioner notes, Claimant told Dr. Alberico on August 30, 2012, that she cancelled the surgery "due to obligations with her children." (Tr. at 637, 660, 1465.) At the administrative hearing however, Claimant testified that she simply had not rescheduled the surgery. (Tr. at 34.) She further testified that there was no guarantee that the surgery would help her condition. (Tr. at 35.) She stated that it was a "scary thought to go be cut on not knowing 100% that it's even going to do any good." (Id.) Claimant however, did not mention the fear of paralysis until she submitted her brief. Thus, it was reasonable for the ALJ to question Claimant's credibility based upon the differing reasons for failing to proceed with the surgery.

The Court further notes that in assessing Claimant's pain and credibility, the ALJ considered the factors set forth in the Regulations. Accordingly, the Court finds that the ALJ's pain and credibility assessment was proper and conducted in accordance with the appropriate Rules and Regulations, and is supported by the substantial evidence of record.

2.  RFC Assessment.

Claimant also alleges that the ALJ erred in assessing her RFC by not according appropriate

weight to the opinion evidence of record. (Document No. 9 at 6-9.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2013). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater,</u> 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

<u>See</u> 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2013).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2012). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite

his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

As discussed above, the ALJ concluded that Claimant was capable of performing light exertional level work, with frequent and occasional postural limitations. (Tr. at 15.) The ALJ further found that Claimant was capable of reaching overhead occasionally, handling and fingering with her right arm frequently, and reaching in all other directions frequently. (Id.) She further found that Claimant must avoid concentrated exposure to extreme cold, wetness, humidity, vibrations, pulmonary irritants, and workplace hazards. (Id.) In assessing Claimant's RFC, the ALJ considered the opinion evidence of record. (Tr. at 18-19.) The ALJ gave limited weight to the opinion of Dr. Guberman because his twenty-four percent whole person assessment was not helpful; during the examination Claimant was capable of maintaining an independent gait without limitations to her lower extremity functioning or range of motion; and his assessed significant limitations in her ability to sit, stand, bend, and stoop were unsupported by his own examination notes. (Tr. at 18.)

The Court finds that the ALJ's decision to assign little weight to Dr. Guberman's opinion is supported by substantial evidence. The ALJ noted that Dr. Guberman's examination revealed moderate tenderness of the right shoulder, reduced range of elbow motion, and slight right arm motor strength weakness. Nevertheless, Claimant was capable of buttoning, picking up coins with either hand, and writing normal with her dominant hand. The examination in all other respects essentially was normal. Thus, although Claimant had some limitation and tenderness, the findings were inconsistent with Dr. Guberman's opinion that she was unable to work. Moreover, the ALJ's RFC was consistent with the opinion of the State agency medical consultant's opinion, Dr.

Boukhemis, to whom the ALJ accorded great weight because the opinion was consistent with Claimant's demonstration of an intact gait and range of motion findings. (Tr. at 18.) Dr. Boukhemis's opinion was consistent with the overall objective evidence that while Claimant experienced some limitations regarding her right arm and neck, she was able to function with the right upper extremity. Despite giving great weight to Dr. Boukhemis's opinion, the ALJ assessed a greater limitations to occasional overhead reaching, frequent handling and fingering with the right arm, and frequent reaching in all other directions due to Claimant's demonstration of weakness and diminished strength of the right upper extremity. (Id.)

The ALJ also considered Ms. Davis's opinion and noted although she was not an acceptable medical source, she found her opinion consistent with Dr. Boukhemis's opinion and noted that Ms. Davis had an opportunity actually to examine Claimant. (Tr. at 18.) Accordingly, based on the foregoing, the Court finds that the ALJ properly considered the opinion evidence, gave appropriate weight to the various medical sources, and that her RFC assessment is supported by the substantial evidence of record.

Regarding Dr. Amores, the ALJ summarized his treatment of Claimant. (Tr. at 17.) Dr. Amores did not necessarily render an opinion, but indicated that Claimant's conditions were permanent and that her prognosis was guarded. However, Dr. Amores did not assess any functional limitations resulting from Claimant's physical impairments. Dr. Amores acknowledged Claimant's complaints of pain and numbness in the right arm and limited range of neck motion. Nevertheless, Claimant maintained a normal gait and had full and active range of motion of all extremities. (Tr. at 17, 615.) Claimant highlights only Dr. Amores's diagnoses and recommendations of surgery. The diagnoses and recommendation however do not establish a disability. Accordingly, the Court finds that the ALJ appropriately considered all the medial

evidence of record and that her RFC assessment is supported by the substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 10.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

. The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 28, 2016.

Omar J. Aboulhosn
United States Magistrate Judge